IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION

No. 7:10-CV-160-D

| | |
|---|---|
| SARAH BROWN, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>)<br>MICHAEL J. ASTRUE, )<br>Commissioner of Social )<br>Security, )<br>)<br>Defendant. )<br>_____ ) | **MEMORANDUM &**<br>**RECOMMENDATION** |

This matter is before the Court upon the parties' cross Motions for Judgment on the Pleadings (DE's 15 & 17). The time for the parties to file any further responses or replies has expired. Accordingly, the matter is now ripe for adjudication. Pursuant to 28 U.S.C. 636(b)(1), this matter has been referred to the undersigned for the entry of a Memorandum and Recommendation (DE-19). For the following reasons, it is RECOMMENDED that Plaintiff's Motion for Judgment on the Pleadings (DE-15) be DENIED, that Defendant's Motion for Judgment on the Pleadings (DE-17) be GRANTED, and that the final decision by Defendant be AFFIRMED.

**Statement of the Case**

Plaintiff is a member of the class entitled to readjudication of her prior claims for benefits under the Stipulation and Order of Settlement in Hyatt v. Shalala, No. C-C-83-655-MU (W.D. N.C. March 21, 1994) (Hyatt III) (Tr. 209-17).

1

Plaintiff first applied for supplemental security income ("SSI") benefits on June 9, 1983, with an alleged disability onset date of June 1, 1983 (Tr. 17). The application was denied initially on September 1, 1983 and upon reconsideration on October 1, 1983 (Tr. 17). An ALJ issued an unfavorable decision on May 10, 1984, and the Appeals Council denied review on February 6, 1987 (Tr. 17).

Plaintiff applied for SSI benefits again on February 10, 1987, and was denied at the initial level on May 8, 1987 (Tr. 17). Plaintiff did not pursue the application further. Plaintiff applied for SSI benefits a third time on July 31, 1990, was denied upon reconsideration on January 29, 1991, and did not pursue the application further (Tr. 17).

Plaintiff applied for SSI benefits a fourth and final time on February 15, 1994, with an alleged onset date of December 1, 1986 (Tr. 17, 36-40). The application was denied initially on March 14, 1994 (Tr. 17, 41-44, 76-80), and upon reconsideration on June 13, 1994 (Tr. 17, 47-50, 72-75). An ALJ issued an unfavorable decision on August 15, 1995 (Tr. 17, 191-204), but the case was remanded by the Appeals Council on May 5, 1997 (Tr. 17, 207-08). A supplemental hearing was held on November 6, 1997 (Tr. 17) during which the Plaintiff amended her onset date to November 30, 1994 (Tr. 298, 479-82). The ALJ issued a fully favorable decision on November 20, 1997 (Tr. 17, 299-312) finding the Plaintiff disabled beginning on November 30, 1994 (Tr. 306).

Plaintiff requested review of her prior applications on November 21, 1994 (Tr. 211). On April 24, 1997, Plaintiff was identified as a member of the Hyatt subclass (Tr. 209-10) entitled to a review of her applications in 1983, 1987, and 1990 under the Hyatt III Stipulation and Order of Settlement (Tr. 18). Accordingly, a hearing was held before an ALJ on April 28, 2009 (Tr. 18, 458-85). Upon readjudication of her prior claims, the ALJ issued an unfavorable decision on June 9, 2009 (Tr. 14-25). Specifically, the ALJ determined that Plaintiff was not under a disability from

June 1, 1983 through November 29, 1994 (Tr. 25). The ALJ's decision became Defendant's final decision when the Appeals Council denied Plaintiff's request for review on August 5, 2010 (Tr. 8-11). Plaintiff filed the instant action on August 19, 2010 (DE-4).

**Standard of Review**

This Court is authorized to review Defendant's denial of benefits under 42 U.S.C. § 405(g), which provides in pertinent part:

> The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing. The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive...

*Id.*

"Under the Social Security Act, [the Court] must uphold the factual findings of the Secretary if they are supported by substantial evidence and were reached through application of the correct legal standard." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996). "Substantial evidence is ... such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971). "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966). "In reviewing for substantial evidence, . . . [the court should not] undertake to re-weigh conflicting evidence, make credibility determinations, or substitute . . . [its] judgment for that of the Secretary." Craig, 76 F.3d at 589. Thus, this Court's review is limited to determining whether Defendant's finding that Plaintiff was not disabled is "supported by substantial evidence and whether the correct law was applied." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir.1990).

**Analysis**

The Social Security Administration has promulgated the following regulations which establish a sequential evaluation process that must be followed to determine whether a claimant is entitled to disability benefits:

> The five step analysis begins with the question of whether the claimant engaged in substantial gainful employment. 20 C.F.R. § 404.1520(b). If not, the analysis continues to determine whether, based upon the medical evidence, the claimant has a severe impairment. 20 C.F.R. § 404.1520(c). If the claimed impairment is sufficiently severe, the third step considers whether the claimant has an impairment that equals or exceeds in severity one or more of the impairments listed in Appendix I of the regulations. 20 C.F.R. § 404.1520(d); 20 C.F.R. Part 404, subpart P, App.I. If so the claimant is disabled. If not, the next inquiry considers if the impairment prevents the claimant from returning to past work. 20 C.F.R. § 404.1520(e); 20 C.F.R. § 404.1545(a). If the answer is in the affirmative, the final consideration looks to whether the impairment precludes the claimant from performing other work. 20 C.F.R. § 404.1520(f).

Mastro v. Apfel, 270 F.3d 171, 177 (4th Cir. 2001).

In the instant action, the ALJ employed the sequential evaluation. First, the ALJ found that Plaintiff did not engage in substantial gainful activity during the period at issue (Tr. 20). At step two, the ALJ found that Plaintiff suffered from one severe impairment: radiation cystitis (Tr. 20). However, the ALJ determined that this impairment was not severe enough to meet or medically equal one of the impairments listed in 20 CFR Part 404, Subpart P, Appendix 1 (Tr. 20). Based on the medical record, the ALJ determined that Plaintiff had the residual functional capacity ("RFC") to perform the full range of light work. Finally, by relying upon the Medical-Vocational Guidelines ("Grids"), 20 CFR Part 404, Subpart P, Appendix 2, the ALJ concluded that there were a significant number of jobs in the national economy that Plaintiff could perform (Tr. 24). Based on these findings, the ALJ determined that Plaintiff was not under a

4

disability at any time from June 1, 1983 until November 29, 1994 (Tr. 25-26). These determinations were supported by substantial evidence, a summary of which now follows.

In February 1978, Plaintiff was diagnosed with cervical cancer and subsequently underwent radiation therapy including a 72-hour cesium insertion (Tr. 262, 445). By July 1978, Plaintiff had completed her cancer therapy (Tr. 262, 442) and examination showed no evidence of persistent or recurrent disease, although mild radiation changes involving the cervix were noted (Tr. 262, 442). Pap smear results were reported as class II mild to moderate atypia (Tr. 262, 442).

Thereafter, Plaintiff's cancer did not return, although from time to time she had genitourinary complaints and abnormal Pap smear results. Most notably, in July 1978, a Pap smear showed class IV results (Tr. 94, 443-44), but visual examination with a colposcope showed no evidence of lesions or malignancy, although there were findings consistent with radiation changes (Tr. 261, 441). Similarly, in September 1979, Plaintiff reported a bloody vaginal discharge. Examination showed an area of necrosis in the upper vagina, and she was prescribed a course of antibiotics (Tr. 253, 437). Biopsies of necrotic areas that were still present in October 1979 showed focal necrosis, fibrosis, and chronic nonspecific inflammation, but there was no evidence of recurrent cervical cancer (Tr. 252, 436). Pap smear results were reported as class II with severe inflammation and mild dysplasia (Tr. 252, 436). By November 1979, Plaintiff reported no further vaginal bleeding and had no complaints other than left-sided pain on severe exertion (Tr. 251). Examination showed some post irradiation changes in the vagina and moderate inflammation as well as slight stenosis of the cervix, but there was no evidence of recurrent disease (Tr. 251). In the two years prior to the alleged onset date, gynecological examinations at New Hanover Memorial Hospital (NHMH) show that the Plaintiff had no complaints and was asymptomatic (Tr. 241-45, 427-30). There was no evidence of recurrent disease, and Plaintiff's Pap smear results were

5

normal.

On March 14, 1983, Plaintiff had no complaints and her gynecologic examination showed no evidence of recurrent disease (Tr. 241). A chest x-ray was negative and a Pap smear showed no dysplasia (Tr. 241). Dr. G. Fletcher Rieman stated on March 30, 1984 that Plaintiff had no "specific gyn complaint[s]" (Tr. 240). Examination showed no evidence of recurrent disease (Tr. 240). A Pap smear was performed and was reported as showing no dysplasia (Tr. 240). Again on March 26, 1985 Plaintiff showed no evidence of recurrent disease nor dysplasia (Tr. 239).

Dr. Ronald Hammock examined Plaintiff on September 16, 1983 (Tr. 269). Plaintiff complained of intermittent gross hematuria (Tr. 269). X-rays reviewed on September 23, 1983 showed mild blunting of calyces, consistent with chronic pyelonephritis (Tr. 272). There was no evidence of ureteral obstruction, pelvic masses or residual urine (Tr. 272). She was ultimately diagnosed with: 1) radiation cystitis and cystitis cystica; 2) urethral stenosis secondary to previous radiation therapy; and 3) possible history of chronic pyelonephritis (Tr. 268). During an October 24, 1983 follow-up, it was noted that Plaintiff was "feeling well" and that most of her symptoms had improved (Tr. 268). Dr. Hammock repeated his diagnosis of radiation cystitis and urethral stricture (Tr. 268). Some mild bilateral caliectasis was observed (Tr. 270). No ureteral stasis was noted, but there was some incomplete emptying of the kidneys bilaterally (Tr. 270). The visualized aspect of Plaintiff's bladder appeared unremarkable (Tr. 270). The diagnosis of radiation cystitis was repeated on November 25, 1983, February 2, 1984 and June 8, 1984 (Tr. 267). Dr. Hammock recommended against hospital fulguration of Plaintiff's bladder for her bleeding because "it [did] not seem to be all that significant" (Tr. 267). On November 27, 1984, Plaintiff was further diagnosed with a urinary tract infection and a trichomonas infestation (Tr. 266). These conditions resolved on December 31, 1984 and Plaintiff was asymptomatic (Tr.

6

265). Plaintiff complained of abdominal cramping on October 28, 1986 (Tr. 264). Dr. Hammock stated on November 7, 1986 that he did not see any significant changes in Plaintiff's urinary system (Tr. 263).

Plaintiff received various treatment from Onslow Memorial Hospital from June 13, 1986 through October 26, 1991 (Tr. 139-157). A mammogram reviewed on June 13, 1986 revealed no masses or nodules (Tr. 157). Likewise, no thickening or other signs of malignancy were noted (Tr. 157). On July 30, 1986, posteroanterior and lateral chest x-rays were negative (Tr. 156). In addition, incomplete emptying of the kidneys bilaterally was observed (Tr. 155). However, the visualized aspect of Plaintiff's bladder appeared unremarkable (Tr. 155). Both of Plaintiff's kidneys functioned properly on November 7, 1986, although some mild bilateral caliectasis was noted (Tr. 155). On November 17, 1986, frontal and lateral chest x-rays were negative (Tr. 154). An x-ray of Plaintiff's cervical spine reviewed on February 6, 1987 showed moderate disc space narrowing at C5-C6 (Tr. 153). However, no slippage or pre-vertebral swelling was noted (Tr. 153). Similarly, an x-ray of Plaintiff's chest revealed no active disease or cardiac enlargement (Tr. 153). Several x-rays reviewed on September 7, 1988 revealed: 1) no skull fractures; 2) no cervical spine fractures; 3) minimal malalignment of the cervical spine; 4) mild disc space narrowing at C5-C6 with anterior spurring; 5) cervical degenerative change with narrowing in some of the mid and lower uncovertebral joints; 6) intact zygomatic arches; 7) orbital asymmetry; 8) clear maxillary sinuses; 9) symmetric maxillary sinuses; and 10) no left knee fractures (Tr. 152). X-rays reviewed on January 31, 1989 revealed no fractures or radiopaque foreign bodies (Tr. 149). Plaintiff was diagnosed with a urinary tract infection on October 26, 1991 and prescribed antibiotics (Tr. 139-140).

Several Pap smears between April 6, 1982 and October 20, 1992 were normal (Tr. 85-86,

7

91-93). In June 1993, Plaintiff reported no gynecological problems, although she did have soreness in the glands on the right side of her throat, and Pap results were reported as within normal limits with mild inflammation (Tr. 83-85, 168, 407-08). In October 1993, Plaintiff reported difficulty and bleeding with urination (Tr. 83). A Pap smear taken at that time or in early November 1993 was unsatisfactory due to blood; a repeat Pap smear in mid-November 1993 showed cellular changes associated with inflammation and the results were reported to Plaintiff as within normal limits (Tr. 81, 168, 406). A pelvic ultrasound reviewed on November 4, 1993 was normal (Tr. 100). Neither Plaintiff's uterus nor her ovaries were enlarged (Tr. 100). No abnormal masses or fluid collections were noted.

A cervical biopsy sample collected on June 7, 1988 demonstrated benign reactive changes (Tr. 159). Likewise, another review on June 15, 1988 revealed no evidence of dysplasia or carcinoma (Tr. 165). Otherwise the biopsy samples only evidenced slight acute inflammation and scant fragments of squamous epithelium which were insufficient for diagnosis (Tr. 165). Upon examination, Plaintiff was found to have no evidence of recurrence of her cervical cancer (Tr. 160). Another vaginal smear was conducted on March 3, 1992 (Tr. 158). Again, it revealed benign reactive changes (Tr. 158).

Diagnostic testing conducted on May 31, 1988 revealed some condylomatous changes (Tr. 274). No malignant cells were identified (Tr. 275).

Plaintiff was deemed partially disabled, although capable of resuming limited duties, by Dr. Daniel Hagan on October 17, 1992 (Tr. 190).

On January 11, 1994 a CT of Plaintiff's parotid glands was reviewed (Tr. 104). There was minimal fullness of the right parotid gland on comparison to the left side. Otherwise, Plaintiff's parotid glands appeared normal (Tr. 104).

Dr. D. Wesley Johnson examined Plaintiff on February 14, 1994 (Tr. 108). Although Plaintiff was being treated for a rash in her pubic area, treatment caused this to go away (Tr. 108). Plaintiff was diagnosed with resolving lymphadenopathy (Tr. 109). A blood profile was conducted to rule out any sexually transmitted diseases (Tr. 109). On February 17, 1994, Plaintiff returned for a follow up (Tr. 107). Dr. Johnson opined that Plaintiff's Hgb was within normal limits and any lab work indicating otherwise was probably machine or lab error (Tr. 107).

Plaintiff's medical records were reviewed by Dr. Frank Virgili on March 14, 1994 (Tr. 76-77). He noted that Plaintiff's blood pressure was normal and Plaintiff was able to breathe well (Tr. 77). Likewise, Plaintiff had good circulation and was able to move her arms and legs normally (Tr. 77). Furthermore, Dr. Virgili observed that Plaintiff's dizziness was improving (Tr. 77). Ultimately, Dr. Virgili determined that Plaintiff was capable of performing most normal activities (Tr. 77).

On May 11, 1994 Plaintiff received emergency room treatment complaining of chest pain and numbness in her left arm (Tr. 122-126). She was eventually diagnosed with gastroesophageal reflux disease and thoracic outlet syndrome (Tr. 122).

Dr. Wesley W. Murfin examined Plaintiff on May 16, 1994 (Tr. 127-133). Plaintiff's primary complaint was carpal tunnel syndrome (Tr. 127). The carpal tunnel syndrome predominantly affected Plaintiff's right hand and had been present since 1987 (Tr. 127). In addition, Plaintiff complained of being constantly tired and having no energy (Tr. 127). Although Plaintiff believed the "oxygen in her blood [was] constantly low", Dr. Murfin observed that recent blood work yielded normal findings (Tr. 127). Likewise, Dr. Murfin observed that Plaintiff did not have "any clear exercise related symptoms" (Tr. 127). During this examination, Plaintiff also complained of irregular and occasionally heavy vaginal bleeding (Tr. 128). Upon examination,

Plaintiff was mildly overweight but otherwise appeared healthy (Tr. 128). She demonstrated a full range of motion and her peripheral joints were normal (Tr. 129). Her gait was unremarkable (Tr. 129). Likewise, Plaintiff was capable of using her hands for fine movements, and no muscle weakness or wasting was apparent (Tr. 129). Although Dr. Murfin diagnosed Plaintiff with carpal tunnel syndrome, he also added that Plaintiff "does not have a history and findings compatible with this . . ." (Tr. 129). He also diagnosed Plaintiff with hypertension, although he indicated that her blood pressure was normal during this examination (Tr. 129). Ultimately, Dr. Murfin stated that Plaintiff could sit, stand, and move about without difficulty (Tr. 130). Likewise, he opined that Plaintiff could lift, carry, handle objects and perform ordinary housework (Tr. 130).

On June 9, 1994, Dr. W.H. Bland reviewed Plaintiff's medical records and determined that Plaintiff's hypertension was controlled (Tr. 75). He also observed that Plaintiff's diagnosis of carpal tunnel syndrome had not been confirmed by studies (Tr. 75). Indeed, a recent examination was negative for carpal tunnel syndrome (Tr. 75). Plaintiff did not suffer from wasting or weariness (Tr. 75). Accordingly, Dr. Bland determined that Plaintiff's symptoms did not warrant any physical functional restrictions (Tr. 75).

Dr. Joseph H. Sykes reviewed Plaintiff's medical records on June 10, 1994 (Tr. 72-73). He noted that Plaintiff's blood pressure was higher than normal at times, but this did not result in any complications considered disabling (Tr. 73). Plaintiff's lungs sounded clear at a recent exam (Tr. 73). Likewise, Plaintiff's headaches and dizziness did not require ongoing or emergency treatment (Tr. 73). In addition, Dr. Sykes opined that Plaintiff's circulation problems were not disabling (Tr. 73). Plaintiff was able to use her hands satisfactorily and there was no sign of muscle weakness (Tr. 73). A tumor in Plaintiff's ear had resolved without complications. The

numbness Plaintiff experienced in her face and head did not keep her from performing her normal activities (Tr. 73). Although Plaintiff was overweight, she was still able to ambulate without assistance and she had good movement in all her joints (Tr. 73). Therefore, Dr. Sykes concluded that Plaintiff did not suffer from a condition that would prevent her from completing most work-related activities (Tr. 73).

A Pap smear in August 1994 showed a low grade squamous intraepithelial lesion, mild dysplasia (CIN 1), with marked inflammation present, findings equivalent to class III (Tr. 170). Pap results in September 1994 were within normal limits and visual examination with a colposcope found no anomalies (Tr. 167).

Plaintiff received treatment from University of North Carolina Memorial Hospital Gyn Tumor Clinic from October 3, 1994 until March 7, 1995 (Tr. 174-181). A vaginal smear collected on October 4, 1994 revealed benign reactive changes (Tr. 179). On examination at UNC, Plaintiff reported occasional vaginal spotting and examination showed a friable area (Tr. 177, 398, 405). There were also two non-staining areas which were biopsied (Tr. 177, 405). Pathological examination showed acute inflammation in one sample, vaginal intraepithelial neoplasia (VAIN) results in the second sample indicating a precancerous condition, and both samples showed cell changes consistent with radiation (Tr. 178, 401). Pathology reported benign reactive changes (Tr. 179, 402). Plaintiff was prescribed Efudex topical ointment (Tr. 176, 404) . On November 29, 1994, Plaintiff returned for follow-up at UNC and was instructed to continue use of the Efudex medication (Tr. 176, 404).

On March 19, 1995, Plaintiff demonstrated no evidence of recurrence of her cervical cancer (Tr. 288). Plaintiff was diagnosed with radiation necrosis (Tr. 288).

The medical record contains a physical capacities questionnaire, which was apparently

11

completed by a physician (Tr. 182-185). However, the date and signature on this questionnaire are illegible (Tr. 185). Regardless, this questionnaire indicates that Plaintiff can: 1) sit, stand, and/or walk for two hours in an eight hour workday; and 2) frequently lift and/or carry up to 10 pounds and occasionally lift up to 20 pounds (Tr. 182). In addition, it was opined that Plaintiff could not use her hands for repetitive actions such as pushing and pulling or other fine manipulation (Tr. 183). The form incongruously indicates both that Plaintiff is and is not able to perform simple grasping with her hands (Tr. 183). Furthermore, it is noted that Plaintiff can occasionally bend, squat, kneel, crawl, climb, reach, stoop, crouch and kneel (Tr. 183). Finally, it was determined that Plaintiff could not tolerate: 1) exposure to unprotected heights; 2) being around moving machinery; 3) exposure to marked changes in temperature; or 4) exposure to dust, fumes and gases (Tr. 184). No medical records are cited to support these assertions, nor does the signing physician provide any additional remarks to clarify the basis for his opinion (Tr. 185).

During the hearing in this matter, Plaintiff testified that she was diagnosed with cervical cancer in 1978 for which she received radiation treatment (Tr. 464). After her treatment, Plaintiff suffered from back pain, heavy bleeding spells, dizziness, high blood pressure and cramps (Tr. 464-466). Plaintiff asserted that these conditions rendered her unable to work (Tr. 465). She also testified that she had been diagnosed with radiation cystitis (Tr. 466). Furthermore, Plaintiff indicated that she suffered from osteoporosis and frequent urinary tract infections (Tr. 468). In addition, Plaintiff experienced fatigue and cramping (Tr. 469). Despite these symptoms, Plaintiff was able to work as a cashier in 1985 (Tr. 469). However, she was eventually fired because she "just couldn't focus" and therefore made frequent mistakes at the register (Tr. 470). Likewise, Plaintiff asserted that working as a cashier raised her blood pressure (Tr. 473). Plaintiff also had difficulty standing up because of pain in back and legs (Tr. 473). Because of this, she had to take

12

breaks more frequently than her co-workers (Tr. 473). During her testimony, Plaintiff asserted that the furthest she could walk was to her mailbox because "her bones were so brittle from that radiation (Tr. 477). She also indicated that she could only lift a maximum of five pounds at a time (Tr. 478).

The ALJ made the following findings with regard to Plaintiff's credibility and ultimate RFC:

> During the period from June 1, 1983 through November 29, 1994, the claimant could sit for 6 hours in an 8-hour day and she could stand and walk for a total of 6 hours in an 8-hour day. She could lift/carry and push/pull 20 pounds occasionally and 10 pounds frequently . . .
>
> At the hearing, the claimant testified that she was found to have cancer in 1978 and she had 7 weeks of radiation treatments. They had to terminate a pregnancy at that time. The claimant said that she had pain and paralysis in her lower right side at that time and that she has had trouble with her side and back ever since. She also had heavy bleeding, high blood pressure, and dizziness. She said that the pain in her side would make her double over. She was not able to lift anything. The claimant said that she filed for disability in 1983 because she was not able to work without bleeding. She was seen by Dr. Garrett who sent her to Dr. Hammock. She had a radiation implant performed. She said that the doctors were concerned about a heart murmur and she had a heart monitor for 3 days. The claimant said that the doctor in Wilmington said that she had cystitis. Dr. Hammock said that her right kidney had shrunk away to about ¼ the size of the left one. She had pain and bleeding and cramping. She also saw Dr. Fletcher Rieman every so often to see if the cancer had returned. She was also getting dye in her arm to see what was going on with her kidneys. She said that she had a lot of urinary tract infections. She was also found to have osteoporosis. She could not stand long due to dizziness, high blood pressure, and anemia. She said that she was very fatigued and stayed tired. The claimant said that the radiation killed a lot of good cells so she was always tired from that. The claimant also testified that she got a job as a cashier in 1985 but she wasn't able to do a good job and was fired after a month or two. She also worked as a cashier little at a store in Richlands for about 6 months. She said that she did not have much education and tried to train herself. She said that she was not able to focus due to her back pain. Her husband left her and she had to support her 6 children. She worked a little bit in 1982 as a cashier at K-Mart. She was fired from that job. The claimant also said that, during the

13

period at issue, she had 2-3 children still at home. She said that her daughter was old enough to work a little bit and the older children helped her out some. Her mother also came to live with her and she helped some. The claimant said that, after she was fired in 1985, she had family supporting her to keep her from sinking and she got food stamps. She had Medicaid at one time. The claimant said that she was fired from her jobs because she was slow and made mistakes. She said that she was not able to focus and her blood pressure was sky high. She was having problems standing up because of her back and legs. She needed more breaks than others and she needed to go to the bathroom a lot during this period. She had infections pretty regularly. The claimant said that her grown daughters performed the household chores. The claimant also testified that she could not walk far at all. She held onto a cart to walk around the grocery store a bit and she was able to walk to the mail box. She said that she had to be careful in the yard because her bones were brittle from radiation. She would get in the short line if she had just a few grocery items. If it was a large order, her daughter did the shopping. The claimant said that she could drive a little at that time but did not go out of town. She could not sit long without her back hurting and she couldn't stand because of her back and legs. She could lift 5 pounds. She said that she took blood pressure medication and potassium and cranberry juice but could not remember her other medications back then. The claimant also said that she does not really remember changing her onset date at the prior hearing and doesn't recall being told about giving up benefits. She thinks she would not have given up any rights. The claimant also said that, if she had known what she was giving up, she would not have signed the amended onset document . . .

After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairment could reasonably be expected to cause the alleged symptoms. However, the claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment as defined for the period at issue.

The claimant had a history of squamous cell carcinoma of the cervix in 1978 which was successfully treated with radiation therapy. She did not have any recurrence of this cancer and did not have any distant metastasis. She did develop a vaginal intraepithelial neoplasm in 1994 but this was also successfully treated with 5FU cream. The claimant's only complication during the period at issue was radiation cystitis and urethral stricture. She did not have any clinical evidence of obstruction and she was treated with antibiotics and urethral dilation. Although the claimant subsequently developed degenerative disc disease with spinal stenosis, there was no evidence of such a condition during the period at issue. In addition, the

> medical evidence pertaining to the period at issue does not reveal any evidence of a change in motor tone or bulk such as disuse atrophy, or other change in body habitus or constitutional appearance such as weight loss, which might be expected in a person whose activities are markedly restricted due to a debilitating disease process. These factors indicate that the claimant's allegations of functional restrictions are not fully credible as they pertain to the period from June 1, 1983 through November 29, 1994 . . .
>
> To summarize, having considered the objective medical evidence, the claimant's subjective complaints, and the opinions of treating, examining, and non-examining physicians, the Administrative Law Judge finds that, during the period at issue, the claimant had the residual functional capacity to perform the full range of light work as defined in 20 CFR 416.967(b).

(Tr. 20-24).

The Court hereby finds that there was substantial evidence to support each of the ALJ's conclusions. Moreover, the ALJ properly considered all relevant evidence, including the evidence favorable to Plaintiff, weighed conflicting evidence, and fully explained the factual basis for her resolutions of conflicts in the evidence. Plaintiff's argument relies primarily on the contention that the ALJ improperly weighed the evidence. However, this Court must uphold Defendant's final decision if it is supported by substantial evidence. Although Plaintiff may disagree with the determinations made by the ALJ after weighing the relevant factors, the role of this Court is not to undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Secretary. Craig, 76 F.3d at 589. Because that is what Plaintiff requests this Court do, her claims are without merit. The undersigned will nonetheless address portions of Plaintiff's specific assignments of error.

**The ALJ properly analyzed Plaintiff's alleged impairments**

Plaintiff asserts that the ALJ erred by not finding her chronic pyelonephritis and urethral stenosis to be severe impairments. However, the ALJ's decision to not include these as severe

impairments at step two is supported by substantial evidence. There is no medical evidence that these periodic impairments imposed more than minimal limitations on basic work activities.

Moreover, "it is not reversible error where an ALJ does not consider whether an impairment is severe at step two of the sequential evaluation, provided the ALJ considers that impairment in subsequent steps." Tarpley v. Astrue, 2009 WL 1649774, at *2 (E.D.N.C. June 1, 2009). Here, the ALJ specifically discussed and evaluated, in detail, evidence concerning each of Plaintiff's impairments, including those impairments that were not specifically identified as being independently "severe" at step two of the process (Tr. 21-24). The ALJ's subsequent and carefully delineated determination of Plaintiff's RFC incorporated the relevant, demonstrable limitations on the basis of that evidence. Accordingly, this assignment of error is without merit.

**The ALJ properly assessed Plaintiff's credibility**

Plaintiff also contends that the ALJ incorrectly assessed her credibility without explanation. The ALJ's findings with regard to Plaintiff's subjective complaints have already been summarized. "Because he had the opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984).

Furthermore, the regulations provide a two-step process for evaluating a claimant's subjective complaints of pain or other symptoms. 20 C.F.R. § 404.1529; Craig, 76 F.3d at 593-96. First, the ALJ must determine whether there is objective medical evidence showing the existence of a medical impairment that could be reasonably expected to produce the pain or alleged symptoms. 20 C.F.R. § 404.1529(b); Craig, 76 F.3d at 594. Second, the ALJ evaluates the intensity and persistence of the symptoms to determine how they limit the capacity for work. 20 C.F.R. 404.1529(c); Craig, 76 F.3d at 595. The ALJ evaluates the intensity and persistence of the

16

Case 7:10-cv-00160-D   Document 20   Filed 04/14/11   Page 16 of 20

symptoms and the extent to which they limit a claimant's capacity for work in light of all the available evidence, including the objective medical evidence. 20 C.F.R. 404.1529(c). At the second step, however, claims of disabling symptoms may not be rejected solely because the available objective evidence does not substantiate the claimant's statements as to the severity and persistence of the symptoms. *See* Craig, 76 F.3d at 595. Since symptoms can sometimes suggest a greater severity of impairment than can be shown by objective medical evidence alone, all other information about symptoms, including statements of the claimant, must be carefully considered in the second part of the evaluation. 20 C.F.R. 404.1529(c)(2). The extent to which a claimant's statements about symptoms can be relied upon as probative evidence in determining whether the claimant is disabled depends on the credibility of the statements. SSR 96-7p, 1996 WL 374186, *4.

Here, the ALJ followed these standards in assessing Plaintiff's credibility. The ALJ's findings of fact demonstrate that the ALJ gave proper weight to all of Plaintiff's limitations and impairments in assessing Plaintiff's credibility. Likewise, the ALJ's citations to Plaintiff's medical records constitute substantial evidence which support that assessment. Accordingly, this assignments of error is meritless.

**The ALJ did not err by using the Medical-Vocational Guidelines**

Plaintiff also alleges that the ALJ erred by not obtaining the testimony of a vocational expert to formulate Plaintiff's RFC. In the instant matter, the ALJ used the Grids to determine that there were jobs in the national economy which Plaintiff could perform. If a claimant has no nonexertional impairments that prevent him from performing the full range of work at a given exertional level, the Commissioner may rely solely on the Grids to satisfy his burden of proof. Coffman v. Bowen, 829 F.2d 514, 518 (4th Cir. 1987); Gory v. Schweiker, 712 F.2d 929, 930-31

17

(4th Cir. 1983). However, the Grids are dispositive of whether a claimant is disabled only when the claimant suffers from purely exertional impairments. Aistrop v. Barnhart, 36 Fed. Appx. 145, 146 (4th Cir. 2002)(unpublished opinion). To the extent that nonexertional impairments further limit the range of jobs available to the claimant, the Grids may not be relied upon to demonstrate the availability of alternate work activities. Grant v. Schweiker, 699 F.2d 189, 192 (4th Cir. 1983). Rather, when a claimant suffers from both exertional and nonexertional limitations, the Grids are not conclusive but may only serve as a guide. Walker v. Bowen, 889 F.2d 47, 49 (4th Cir. 1989)(*citing* Wilson v. Heckler, 743 F.2d 218 (4th Cir. 1984)). A nonexertional limitation is a "limitation that is present whether the claimant is attempting to perform the physical requirements of the job or not . . . [s]uch limitations are present at all times in a claimant's life, whether during exertion or rest." Woody v. Barnhart, 326 F. Supp.2d 744, 752 (W.D.Va. 2004)(*quoting* Gory 712 F.2d at 930)). Typically, they are conditions such as mental disorders, environmental intolerances, substance addictions, or sensory impediments. *Id.* (*citing* 20 C.F.R. § 1569a, SSR 96-8p; and Walker, 889 F.2d at 48-49 (4th Cir. 1989)). Furthermore "[a] non-exertional limitation is one that places limitations on functioning or restricts an individual from performing a full range of work in a particular category." Aistrop, 36 Fed. Appx. at 147(*citing* Gory, 712 F.2d at 930). However, not every nonexertional limitation or malady rises to the level of nonexertional impairment, so as to preclude reliance on the Grids. Walker, 889 F.2d at 49 (*citing* Grant, 699 F.2d at 189). The proper inquiry is whether the nonexertional condition affects an individual's RFC to perform work of which he is exertionally capable. *Id.*

Here, the ALJ did not limit Plaintiff's RFC based on any non-exertional impairments, finding that Plaintiff could perform a full range of light work. (Tr. 20, 25). The Court has

18

already determined that these findings were supported by substantial evidence in the medical record. Plaintiff argues that the ALJ improperly applied the Grid Rules to determine that Plaintiff was not disabled because Plaintiff has non-exertional impairments such as pain and difficulty concentrating (DE-16, pg. 11-12). However, pain and difficulty concentrating are not medically determinable impairments but rather symptoms and, in accordance with the two-step process outlined in the Regulations, set forth in the ALJ's decision (Tr. 22-23). As discussed above, the ALJ explained in his decision why he did not find the Plaintiff fully credible as regards to the intensity, persistence, and limiting effects of her symptoms (Tr. 23). Furthermore, Plaintiff has not suggested any specific non-exertional limitation the ALJ should have included in Plaintiff's RFC. The ALJ reviewed the Plaintiff's allegations, the medical evidence, and medical opinions, and substantial evidence supports his determination that Plaintiff remained capable of a full range of light work (Tr. 20-24). In light of this RFC, the ALJ did not commit error in relying on the Grid Rules to make a showing that Plaintiff remained capable of work activity during the period under consideration.

Plaintiff also argues that the ALJ should have found that the Plaintiff was only capable of sedentary work and therefore should have applied Grid Rule 201.09 to find Plaintiff disabled as of her fourth application on February 15, 1994 when Plaintiff was 50 years old (Pl. Mem. 12). However, Plaintiff does not present any argument as to why the ALJ should have found Plaintiff capable of only sedentary work. The ALJ properly explained why he did not accept the Plaintiff's allegations of limited exertional capability (Tr. 23) and his analysis, reasoning, and ultimate finding that Plaintiff remained capable of a full range of light are all supported by substantial evidence in the medical record. Accordingly, the ALJ's reliance on the Grids was proper.

**The ALJ Properly Considered the Medical Opinion Evidence**

Plaintiff argues that the ALJ committed error when he gave no weight to a medical source statement (Tr. 182-85) because the year the statement was prepared is not recorded and the signature of the source of the statement is illegible (Tr. 24). Plaintiff argues that the ALJ should have contacted the clinic to obtain more information about the statement, citing the Social Security regulations relating to recontacting medical sources (DE-16, pg. 12-13). See 20 C.F.R. § 416.913(e). However, if a physician's opinion is not supported by clinical evidence it should be accorded significantly less weight. Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996). In this case, the medical source statement is simply a checklist without any supporting objective medical findings or explanation, other than a checklist entry that "redness" is an objective sign of pain (Tr. 182-85). All the sections that request a narrative explanation (e.g., "Limitations due to" and "Remarks") are blank (Tr. 182-85). The relevant treatment records from the clinic do not provide any objective findings that would reasonably support the opinion's conclusions and restrictions (Tr. 158-65, 174-81, 239-62). Accordingly, the ALJ did not err when he gave this opinion no weight.

**Conclusion**

For the reasons discussed above, it is RECOMMENDED that Plaintiff's Motion for Judgment on the Pleadings (DE-15) be DENIED, that Defendant's Motion for Judgment on the Pleadings (DE-17) be GRANTED, and that the final decision by Defendant be AFFIRMED.

SO RECOMMENDED in Chambers at Raleigh, North Carolina on Thursday, April 14, 2011.

_____
WILLIAM A. WEBB
UNITED STATES MAGISTRATE JUDGE